# Court of Errors.

## ALBANY, FEBRUARY 28, 1825.

The North River Steam-Boat Company  
   v.      } APPEAL.  
  John R. Livingston.

Opinion of Chief Justice SAVAGE, upon an appeal from the decision of the Chancellor, in the case of the steam-boat Olive Branch— delivered in the Court of Errors, February 28, 1825.

THE appellants filed their bill in the Court of Chancery, charging the respondent with a violation of their exclusive right to navigate the internal waters of this state, by navigating on the said waters from New-York to Albany with his steam-boat the Olive Branch, for the purpose of carrying passengers. They prayed an injunction to restrain and prevent such navigation.

The opposition to the motion for an injunction rested upon a copy of the enrolment of the steam-boat Olive Branch, and a license for the coasting trade, and also the affidavit of the defendant, relying upon an intercourse with the state of New-Jersey. The plaintiffs allege that the intercourse with the city of New-Jersey was collusive and fraudulent, and not a *bona fide* voyage to or from another state.

The Chancellor granted the injunction to restrain the defendant from navigating directly from New-York to Troy, when there is no voyage made by said steam-boat to or from another state ; but denied the injunction to prohibit the navigation of the steam-boat Olive Branch to or from another state. The latter part of the decree. only is appealed from.

The respondent denies any title in the plaintiffs to an exclusive right of navigation with steam-boats in the

ALBANY,
1825.

N. R. Steam-
Boat Company
v.
Livingston.

waters of this state, and contends, that unless their right
be first established, the question of fraud or no fraud is
altogether immaterial.    Under this view of the rights of
the respondent, the whole question has been argued by
counsel before this court.    I proceed, therefore, to in-
quire, whether the appellants have any right to ·the ex-
clusive navigation of the waters of this state with vessels
propelled by steam ; and, particularly, whether they
have such right in the waters of the Hudson river.

The appellants have all the right which was granted
to Livingston & Fulton.    The validity of that grant is
denied.    It has been asserted by the courts of this state ;
and denied by the Supreme Court of the United States.

The point of inquiry, then, will be, whether any part
of the grant is still valid ; and, if any, whether it exists as
to the waters of the Hudson river.

Upon the argument of this cause, the counsel agreed
in urging upon the court the propriety of adhering to
former decisions not overruled, upon the ground that a
court of dernier resort cannot review its own decisions ;
and that its adjudications must remain the law, until
altered by legislative authority. It will be useful, there-
fore, before entering into any discussion as to the con-
stitutionality of the laws in question, to ascertain pre-
·cisely what has been judicially determined, both by this
court and by the Supreme Court of the United States ;
that while we adhere with firmness to decisions of this
court deliberately made, we may recede with respectful
submission from so much as has been overruled by the
superior tribunal.

The constitutionality of the laws relative to steam-boats
was first drawn in question in the case of Livingston &
Fulton v. Van Ingen and others, 9 Johns. Rep. 507.    In
that case, the title of the plaintiffs was substantially

like that of the plaintiffs here. The defendants were charged with violating the plaintiffs' exclusive right by navigating with steam-boats between New-York and Albany. The defence in that case differed from this, in as much as no coasting license was shown. The defence rested on the ground, that by the adoption of the constitution of the United States, the state had parted with all right to legislate on the subject, and that, therefore, the acts were unconstitutional and void. This defence was unanimously overruled by the court, on the broad ground of the constitutionality of the laws; but as no decision can be considered absolute authority, except upon a state of facts similar to those adjudicated upon, the case of Livingston v. Van Ingen is an authority so far as the facts are similar, but when they differ, it is no farther authority than the reasoning of the judges is applicable, and then only as the opinions of learned men on the question.

In the case of Gibbons v. Ogden, 17 Johns. 488., Ogden, the complainant, in the Court of Chancery, charged the defendant, Gibbons, with an infringement of the exclusive grant to Livingston & Fulton, which he, Ogden, held by assignment, by navigating with his steam-boats, the Stoudinger and Bellona, between New-York and Elizabethtown point. The defendant justified on the ground that his boats were above 20 tons burden, and had been duly enrolled and licensed under an act of Congress; and he insisted that, under such licenses, his boats might be lawfully employed and navigated in the coasting trade between parts of the same state or of different states, and could not be excluded or restricted therein by any law or grant of any particular state. This defence was overruled by the late Chancellor, who did not consider the

license as conferring any right whatever. He held that the license only gave the vessel an American character, but left the owner of the vessel precisely where he was before the license, in respect to the exclusive grant claimed by Livingston & Fulton and their assigns. When the cause was brought into this court, by appeal from the decretal order of the Chancellor, Mr. Justice Platt, who delivered the unanimous opinion of the court, agrees with the Chancellor in the opinion, that the only effect of the license is to determine the national character of the vessel, and the rate of duties which she is to pay; and he adds, that "such a vessel, coasting from one state to another, would have exactly the same right to trade, and the same right of transit, whether she had the coasting license or not ;" And the order of the Chancellor was affirmed, on the ground that the question had been settled in the case of Livingston vs. Van In-gen. The decree of the Chancellor, which was affirmed in this court, declares the several acts of the legislature of the state of New-York, granting the exclusive right, to be valid, notwithstanding the objections taken by the defendant; "and that the complainant is well entitled to the right exclusively to navigate the waters for that purpose mentioned in the said bill of complaint, with boats moved by steam or fire; and that the defendant cannot lawfully navigate the same with the steam-boats of him the said defendant, &c. under the respective enrolments and licenses, &c."

When this decree and the whole proceedings were carried into the Supreme Court of the United States, that court was of opinion that the several licenses to the steam-boats, the Stoudinger and the Bellona, to carry on the coasting trade, &c. "give full authority to those

vessels to navigate the waters of the United States, by steam or otherwise, for the purpose of carrying on the coasting trade, any law of the state of New-York to the contrary notwithstanding; and that so much of the several laws of the state of New-York as prohibits vessels licensed according to the laws of the United States, from navigating the waters of the state of New-York, by means of fire or steam, is repugnant to the said constitution, and void." The decree was therefore reversed.

The facts in the two cases cited were not similar to each other, nor to this case. In the first, that of Livingston v. Van Ingen, the controversy was as to the validity of the state grant within the bounds of the state; but the effect of a license, under the act regulating the coasting trade, could not be considered, because it was not a fact in the case. In the second case, that of Ogden v. Gibbons, the effect of a coasting license was considered, both by the court of Chancery and by this court, and the license was adjudged to give no right whatever. In this opinion both courts erred, as is proved by the decision of the Supreme Court of the United States; by which it is settled, that a steam-boat navigating with a coasting license, performing a voyage from a port of another state to a port in this state, is authorized to navigate the waters of this state, the laws of this state to the contrary notwithstanding.

But whether a steam-boat may navigate the waters of the Hudson within the state, in opposition to the grant to Livingston & Fulton, though under the authority of a license, is a question which has not yet been decided in terms by this court or the Supreme Court of the United States; but it seems to me to have been virtually decided by both courts. In this court the only effect of

ALBANY,
1825.

N. R. Steam-
Boat Company
v.
Livingston.

the license was declared to be that of giving an Ameri-
can character, and that it conferred no right in a case of
intercourse between this state and the state of New-Jer-
sey ; of course, it could have no effect where the inter-
course was entirely within the state.   In the Supreme
Court of the United States, the language of the decree
is, that " the several licenses to carry on the coasting
trade, give full authority to those vessels to navigate the
waters of the United States by them or otherwise, for the
purpose of carrying on the coasting trade." I agree
that the decision of the court is to be considered in re-
ference to the facts of the case ; and that the facts in
that case were different from this, inasmuch as there
the voyage was from a port in another state.   Certain
points, however, have been decided which were in a de-
gree necessary to the decision given in the case.   Some
of the points decided by the Supreme Court are :

1. That the power to regulate commerce among the
states is exclusive.

2. That commerce means not only trafick, or the ex-
change of commodities, but also intercourse : that it in-
cludes navigation.

3. Congressional power of course to regulate naviga-
tion—this regulation of commerce and navigation must
take place within the state, the waters of the United
States are necessary waters of some particular state.
Congress must act on the subject where it exists.

4. That this right of intercourse does not depend on
the constitution and laws of congress, yet congress has
power to regulate that right, and has done so by " an
act for enrolling and licensing ships or vessels to be em-
ployed in the coasting trade and fisheries, and for regula-
ting the same."   Passed 18th February, 1793.

5. That this act implies unequivocally an authority to licensed vessels to carry on the coasting trade—the license is the language of the legislature, and transfers to the grantee all the right which the grantor can transfer.

6. That what is meant by the coasting trade is defined in the act of 1793.

7. That steam-boats are to be enrolled and licensed in the same manner as vessels propelled by wind, and are entitled to the same privileges. It is also intimated, and an opinion expressed, though not judicially decided, that the transportation of passengers is equally a branch of the coasting trade as the transportation of goods ; that congress has power to license vessels to sail from one port to another in the same state ; and that this power implies no claim of a direct power to regulate the purely internal commerce of a state, or act directly on its system of police.

From these premises, it seems to me to follow, as a corollary, that vessels with a coasting license are authorized to navigate for the purpose of carrying on the coasting trade in all the navigable waters of the state, in which the coasting trade can exist.

If I am correct in these inferences, they lead necessarily to the decision of this cause, and then the objection, that we ought not to go in advance of the Supreme Court, is altogether inapplicable.

Before proceeding to apply these principles, it is proper to settle the meaning of certain words and phrases used in this controversy. What then do we understand by commerce among the states ? In what does the coasting trade consist ? And what is internal commerce ? Do

ALBANY,
1825.

N. R. Steam-
Boat Company
v.
Livngston.

they interfere with each other, or where is the boundary that marks the limit of each ?

It has been contended that commerce among the states means a voyage from state to state, commencing in a particular state, and terminating, as respects the authority of the license, at the boundary line of the state entered ; and that the subsequent progress of the vessel is under state regulations. If this were correct, then the vessel making a voyage from a port in one state to a port in another state, must navigate subject to the state regulations of the state in which she commences her voyage, until she touches the boundary line of such state ; and at the moment when she leaves the jurisdiction of the one state, she enters the jurisdiction of the other, and then navigates subject to the state regulations of the state she has thus entered, until she completes her voyage. Hence she is under the control of state regulations during her whole voyage, except perhaps at the moment of passing the boundary line. By this construction congress is ousted of its jurisdiction altogether ; and that clause of the constitution which gives congress power to regulate commerce among the states becomes a dead letter. The Supreme Court says, "commerce among the states cannot stop at the boundary line of each state, but may be introduced into the interior." Again : "commerce among the states must of necessity be commerce within the states." In the same opinion we find as full a definition of the term as the face of the case required, and beyond that it was not necessary to go : accordingly it is said, " comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more states than one." Again : "the genius and character of the whole government seem to

be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally ; but not to those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere for the purpose of executing some of the general powers of the government ; the completely internal commerce of a state, then, may be considered as reserved for the state itself."

It is evident from these expressions, that the Supreme Court was of opinion that over a part of the internal commerce of the states  congress has power,—precisely how far that power extends, it did not become necessary to decide :—But from the expression *completely internal, exclusively internal*, and *purely internal*, it is clearly inferible, that all that part of the internal commerce of a state which is not *exclusively internal,* is subject to the regulation of congress.  How far, then, within the state, does that commerce extend which is not *completely* internal ? If all commerce which enters the exterior lines of a state is internal, and exclusively so, then all commerce would be included, as well foreign as among the states, which is directly contrary to the decision and to the constitution.   The counsel for the appellants contended, if a steam vessel from another state, with a coasting license, has a right to enter a port in this state, that at the exterior port the voyage is terminated as between the states, and that she cannot proceed to any other place within the state, except in subjection to the exclusive grant. His honour the Chancellor decides that such a vessel may proceed to any port in this state, and depart from any port in this state, and proceed to another, and touch at intermediate places ;

and that the navigation which is subject to the state grant is that which takes place between any two points in this state, when the voyage is not a continuation of a passage to or from another state. The Supreme Court says, " if congress license vessels to sail from one port to another in the same state, the act is supposed to be necessarily incidental to the power expressly granted to congress, and implies no claim of a direct power to regulate the purely internal commerce of a state, or to act directly on its system of police."

The power of congress to license vessels to sail from one port to another in the same state, is here distinctly asserted, as incidental to the power directly granted. It seems also to be, impliedly at least, admitted, that this is a regulation of commerce within a state, and subject to state legislation. It is elsewhere asserted that the power to regulate commerce with foreign nations and among the states, is necessarily an exclusive power. From what is here said, it seems that the incidental power to regulate commerce within the state, is a concurrent power ; and if so, it is admitted that in case of collision, the law of congress must prevail. But the opinion here seems to consider the purely internal commerce as not affected by the act of licensing vessels to sail from port to port within the state. If this be so, then the internal commerce over which the state has exclusive controul, is something existing where coasting vessels cannot come, or have no right to navigate, as in the case of a ferry within the state. And hence it follows, that the commerce among the states, which congress has power to regulate, either directly or incidentally, is that commerce which may be carried on by vessels regularly licensed by the law of congress : or in other words, the coasting trade.

This brings me to the inquiry, what is the coasting trade? The answer to this inquiry is to be found in the laws of congress, the first of which is entitled " an act for registering and clearing vessels, regulating the coasting trade, and for other purposes," passed September 1st, 1789; but more particularly in " an act for enrolling or licensing ships or vessels to be employed in the coasting trade and fisheries, and for regulating the same," passed February 18th, 1793. It cannot now be necessary to enter into a minute analysis of the sections of this last mentioned act; a general reference to some of its provisions being sufficient for my present purpose.

This act contains in the first section a prohibition of all vessels except those authorized as is therein provided, from carrying on the coasting trade. The license there gives the authority, or the act regulates a right, previously existing, (and it is in my opinion immaterial which, for the purpose of deciding this controversy,) and particularly specifies the mode of carrying on trade in certain vessels on the coast, or a navigable river between districts in different states, and districts in the same state, and different places in the same district. This then is the definition given by congress to the term " coasting trade." Chief Justice Marshall so understands it when he says, " the coasting trade is a term well understood. The law has defined it, and all know its meaning perfectly. The act describes, with great minuteness, the various operations of a vessel engaged in it." According to the definition of the coasting trade, as extracted from the act of congress of February 18th, 1793, it means commercial intercourse carried on between different districts in different states, between different districts in the same state, and between different places in the same district, on the sea coast, or on a na-

vigable river. Agreeably to this definition, a voyage in a vessel of suitable tonnage from New-York to Albany, is as much a coasting voyage as from Boston to Plymouth or New-Bedford. In both, the *termini* are in the same state, and within the navigable waters of the United States, though in one the navigation is upon a river, in the other on the ocean.

The government of the United States have no jurisdiction, (the district of Columbia and the territories excepted,) where a state has not also jurisdiction for state purposes, and I can see nothing in the nature of our government which excludes the authority of congress from our navigable rivers.—They are arms of the sea. As well might Louisiana shut the mouth of the Mississippi, or Virginia the Chesapeake, as New-York the Hudson. In corroboration of this construction is the fact, that all vessels employed in navigating the river take a coasting license. I am aware that it is said that the license is given not under the power to regulate commerce, but the power to lay and collect taxes. When congress have power to do the same act by virtue of distinct powers, they may exercise which they please; and when they profess to act under the power to regulate commerce, as they do in this act, there is no necessity to resort to any other. I need not, therefore, inquire whether the license does not more properly emanate from the taxing power. Under whatever power it is issued, it proves that the vessel has complied with the regulations of congress respecting the coasting trade, and is entitled to all the privileges of coasting vessels. A discussion of this question is superseded by an express adjudication. The language of the Supreme Court is, "To the court it seems very clear, that the whole

act on the subject of the coasting trade, according to those principles which govern the construction of statutes, implies unequivocally an authority to licensed vessels to carry on the coasting trade." Again: "The license must be understood to be what it purports to be, a legislative authority to carry on the coasting trade."

What then is internal commerce?

An answer to this inquiry will necessarily lead to some repetition. It is contended by the appellants, and is decided by the Chancellor, that it comprehends all that navigation where the *termini* of the voyage are both within the same state.—Chief Justice Marshall has said that the word "among" may properly be restricted to that commerce which concerns more states than one.— Again: "the enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the *exclusively* internal commerce of a state. The genius and character of the whole government seem to be that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally; but not those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere for the purpose of executing some of the general powers of the government. The completely internal commerce of a state, then, may be considered as reserved for the state itself." What is here said, it must be admitted, conveys no definite idea of what is the *completely* or *exclusively internal commerce* alluded to. In a subsequent part of the opinion, an explanation is to be found. When speaking of the inspection laws, he observes, "They form a portion of that immense mass of legis-

lation which embraces every thing within the territory
of a state not surrendered to the general government,
all which can be most advantageously exercised by the
states themselves. Inspection laws, quarantine laws,
health laws of every description, as well as laws for re-
gulating the internal commerce of a state, and those
which respect turnpike roads, ferries, &c. are compo-
nent parts of this mass." "No direct general power
over these objects is granted to congress; and conse-
quently they remain subject to state legislation. If the
legislative power of the union can reach them, it must
be for national purposes; it must be when the power is
expressly given for a special purpose, or is clearly inci-
dental to some power which is expressly given. It is
obvious that the government of the union, in the exer-
cise of its express powers,—that, for example, of regu-
lating commerce with foreign nations and among the
states,—may use means that may also be employed by
a state in the exercise of its acknowledged powers;
that, for example, of regulating commerce within the
state. If congress license vessels to sail from one port
to another in the same state, the act is supposed to be
necessarily incidental to the power expressly granted to
congress, and implies no claim of a power to regulate
the purely internal commerce of a state; or to act di-
rectly on its system of police.

A definition of what is meant by internal commerce,
appears in part by the above extract from the opinion
of the Supreme Court. To extend it to all its various
subjects, would here be entirely useless. The object of
the present inquiry is completely answered by showing
what is not that purely internal commerce spoken of as
exclusively subject to the state legislation : And I trust

I have already shown that the navigation of the Hudson, a public navigable river, is not included in such internal commerce ; but that it composes a part of the coasting trade, and is, therefore, subject to the regulation and control of congress.

In my judgment, then, the case of Gibbons v. Ogden decides, that the commerce subject to the controul of congress is the coasting trade, which includes the transportation of passengers. That the coasting trade may lawfully be carried on by licensed vessels in all the navigable waters of the United States including all rivers approachable from the coasts. If this be so, then the Olive Branch was engaged in a lawful trade, and had a perfect right to the navigation of the Hudson. I will therefore detain the court but a moment, while I add a few general remarks.

Much difference of opinion exists on the question of construction to be given to the constitution of the United States : Some contending that it should receive a liberal construction, and others, that it should be so construed as best to promote the great objects for which it was made. This object will be best answered by avoiding either extreme of the rules of construction, and keeping steadily in view the purposes for which the government was instituted, " to form a more perfect union, establish justice, ensure domestic tranquillity, provide for the common defence, promote the general welfare, and secure the blessings of liberty." Under the articles of confederation, the states were sovereign and independent—too much so for the mutual safety and prosperity of the whole. The states, therefore, in adopting the federal constitution, parted with a portion of their individual sovereignty, in order to give the head of

the confederacy stronger powers, by which to draw closer together the different parts of this widely extended government. Before that time, the several states imposed what duties they pleased, not inconsistent with public treaties, and were perfectly sovereign and independent as to regulating all other commerce within their respective limits—subject to one restriction only, to wit, that the people of other states should enjoy therein all the privileges of trade and commerce, subject to the same duties, &c. as the inhabitants of such states; provided such restrictions did not prevent the removal of property to another state, of which the owner should be an inhabitant, and that no duties should be laid on property of the United States, or either of them.

This power of regulating commerce led to many difficulties and embarrassments, as we learn from the history of the times; and to prevent a recurrence of those commercial difficulties was one great and leading inducement to the adoption of the present constitution. Any power, therefore, given to congress, short of the power to regulate that commerce to which the people of the United States had access, would not have secured the object so desirable to be attained. And it never could have been intended that within the territory of a particular state congress should define the rights and privileges of citizens of other states, while the state legislature should define the rights and privileges of its own citizens in relation to the same subject. The framers of the constitution never supposed that they were splitting the jurisdiction over the subject, and leaving it liable to most of the difficulties which previously existed. If the several states may still regulate commerce within the limits of their states, to the exclusion of con-

gress, there is nothing left for congress to act upon.  If
the power of congress is limited to voyages commencing
in one state and terminating in another, then its jurisdic-
tion is much abridged, and much of the act regulating
the coasting trade should be repealed.

To show the understanding of those who framed and
adopted the constitution, we have only to look at the
acts of congress immediately consequent upon its adop-
tion.   And we find, that at the first session of the first
congress, one of the first acts passed, is " an act for
registering and clearing vessels, regulating the coasting
trade, and for other purposes," passed the 1st of Septem-
ber, 1789, containing substantially the provisions of the
act of 1793.   By this act, licensed vessels are author-
ized to trade from district to district.   By what authori-
ty did congress undertake to regulate the coasting trade ?
The *coasting trade* is a term not to be found in the con-
stitution.   It need not be contended to be the execution
of the power to collect taxes, &c. ; for it has been de
cided to have been an execution of the power to regu-
late commerce.   What commerce ? Surely not foreign
commerce, nor among the Indian tribes ? it must mean,
then, " commerce among the several states."   Congress
then passed the act regulating the coasting trade, under
the power to regulate commerce among the several
states.   This was a contemporaneous exposition of the
constitution with which all were satisfied ; and it was
not then thought that state boundaries had any effect or
influence upon this kind of navigation.   It was not then
thought that the coasting trade, or commerce among the
states, must consist of voyages from state to state only ;
that was the discovery of later times.   It was then
thought that commerce among the states, meant among

the people of the states—that this commerce was internal as related to the government of the United States and its citizens, and as contradistinguished from foreign commerce. It was at that time supposed that the constitution intended to guaranty to the citizens of the whole United States an equality of commercial rights and privileges. Hence the restriction on congress, that "no preference shall be given by any regulation of commerce or revenue to the ports of one state over those of another;" and hence also the subsequent provision, that "the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states." The framers of the constitution thought it unnecessary to declare the converse of the last provision, to wit, that the citizens of each state shall be entitled, within their own state, to all the privileges and immunities which citizens of other states enjoy within such state.

How is this fact under the principle contended for by the appellants? Citizens of other states, coming from a port in their own state, have a right to navigate freely with their steam-boats, in our waters, and from port to port, while our own citizens are excluded from such navigation from port to port, unless the voyage extends out of the state. I mention this as an inconsistency growing out of the construction contended for. One leading object of the constitution was to secure an equality of commercial rights to the citizens of the general government, in whatever state they might reside. We ought not to forget that we are the citizens of two distinct, yet connected governments. Each has its proper sphere of action: The powers given to the general government are to be first satisfied—some of these powers

are exclusive, and some concurrent; but when concurrent, the provisions of the general government are paramount. Whether powers are exclusive or concurrent, is to be determined more by the nature of the power itself, than by the phraseology of the constitution. Under the old confederation, the states retained the character of independent and sovereign states. Under the present constitution, for certain specified purposes, the distinction of states is partially lost, and we become a single consolidated government. It is in this character that congress executes its powers; and having in this character power to regulate commerce among the states, that power must necessarily reach the subject where it exists; and so far as navigation is concerned, it exists where the coasting trade exists, and is therefore subject to the regulations of congress.

We are told that there is great danger of encroachment by the general government, and that the state governments will be swallowed up by it; and therefore that the state laws should be supported. My answer is, if such danger exists, the states should not provoke such a termination of their existence by encroachments on their part; nor should they submit to usurpation.— There is no difficulty in harmonizing, if each government will be content with the powers possessed by it. But why should we more apprehend an abuse of power, or an act of usurpation, by the general than by the state governments? Both are constituted by the representatives of the people—every member of the national legislature is a citizen of some state, and of course feels state partialities, and perhaps jealousies; and should be presumed, in the absence of proof to the contrary, equally jealous of the rights of his constituents as the

members of our state legislatures.  I am fully sensible of the propriety of preserving the state governments, with all their rights and powers ; but this is by no means inconsistent with conceding to the general government its appropriate powers.

We were cautioned upon the argument to beware how we admit the authority of congress to regulate navigation within the waters of the Hudson, as we should thereby abandon the right to license ferries and receive toll on our canals.  The supreme court expressly disavows any authority in congress to interfere with the purely internal commerce or police of a state.  Ferries may be subject to the acts of congress, so far as they are used for carrying on the coasting trade ; but those ferries which are the subjects of state grant, if they can be called commercial regulations at all, belong clearly to the internal commerce of the states.  We are told that the grant to the plaintiffs is only a ferry from Albany to New-York.  If the exclusive grant be really a right of ferry, the plaintiffs may occupy with their boats every ferry in the state, and thus destroy the rights of all others.  But there is no pretence for denominating their grant a ferry.  To speak of a ferry from New-York to Albany, is as great an abuse of terms, as to talk of a ferry from New-Orleans to St. Louis or Pittsburgh, or even from New-York to Liverpool.  Those ferries over which the state exercises its appropriate authority, are those not connected with the coasting trade—they are not, in the constitutional sense, commercial relations.  But if they were, they belong to that exclusively internal commerce over which congress has no control.  Our right to regulate navigation upon our canals rests upon a still firmer basis.  They are no part

of the navigable waters of the United States within the act regulating the coasting trade, or the constitution. Congress may, indeed, under the taxing power, impose taxes upon canal boats, as they may upon every species of property within the states; but that gives them no direct power to regulate the navigation upon our canals, or upon our inland lakes and rivers. The authority of congress to regulate navigation is confined to our coasts, bays, and navigable rivers.

If I am correct in the views which I have taken of this subject, an injunction cannot be granted, whether the respondent carried on what has been denominated a fraudulent intercourse with New-Jersey or not. I forbear, therefore, an examination of that part of the decree of his honour the Chancellor.

But even if the conclusion which I have drawn from established premises, be not admitted as absolutely correct and conclusive, is there no *doubt* on the subject? After the highest judicial tribunal in our country has said that "so much of the several laws of the state of New-York as prohibits vessels licensed according to the laws of the United States, from navigating the waters of the state of New-York by means of fire or steam, is repugnant to the said constitution, and void," can it be pretended that the claim of the appellants is no longer doubtful? The plea in the case of Gibbons v. Ogden distinctly asserted the right to navigate between different places in the same state. This was part of the issue; yet the court broadly asserted the right of licensed vessels "to navigate the waters of the United States by steam or otherwise, for the purpose of carrying on the coasting trade, any law of the state of New-York to the contrary notwithstanding." In Livingston v. Van Ingen,

the late Chancellor *Kent* says, " injunctions are always granted to secure the enjoyment of statute privileges, of which the party is in the actual possession, *unless the right be doubtful.*" This is undoubtedly the correct rule, and the true result of an examination of the adjudged cases.

If any thing were wanting, in addition to the express and unequivocal language of the Supreme Court of the United States, to show that the appellants have not a clear right, free from doubt, it is found in the peculiar situation in which an injunction will place the citizens of this state. They are forbidden rights which are open to, and may be enjoyed freely by all the world beside. If the injunction is granted, it cannot secure to the appellants their monopoly. The citizens of other states, with their steam-boats, have full right to navigate our waters, and carry on a profitable business, commencing or terminating their voyage in their own state; while our own citizens must stand with their arms folded and look on, unless they too terminate their voyages without the state. If this deplorable state of things necessarily results from the constitution and laws of our country, it must be submitted to with what grace we can; but is it not a powerful argument to prove that the reasoning which leads to such a result is unsound?

For these reasons, I am of opinion that an injunction ought not to be granted; and that the decree of his honour the Chancellor, refusing an injunction, be *affirmed.*

The vote in this case was as follows:

*For affirming.*—Chief Justice Savage, Messrs. Bowman, Brayton, Burrows, Burt, Clark, Cramer, Dudley, Earll, Ellsworth, Gardiner, Keyes, Lefferts, Lynde,

ALBANY;
1825.

N. R. Steam-
Boat Company
v
Livingston.

Mallory, M'Call, M'Intyre, Morgan, Redfield, Ward, Wooster, Wright—22.

*For reversing.*—Judge Woodworth, Judge Sutherland, Messrs. Crary, Haight, Lake, M'Michael, Nelson, Thorn, Wilkeson—9.